**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion C. Passmore (SBN 228474)
  passmore@bespc.com
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 304-0506

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOWNER, Derivatively on Behalf of EVERBRIDGE, INC., | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| DAVID MEREDITH, PATRICK BRICKLEY, JAIME ELLERTSON, RICHARD D'AMORE, ALISON DEAN, BRUNS GRAYSON, KENT MATHY, SIMON PARIS, and SHARON ROWLANDS, | |
| Defendants, | |
| and | |
| EVERBRIDGE, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff John Downer ("Plaintiff"), by and through his counsel, derivatively on behalf of nominal defendant Everbridge, Inc. ("Everbridge" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Everbridge with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Everbridge; (iii) a purported class action lawsuit filed in the United Stated District Court for the Central District of California against Everbridge and Defendants David Meredith ("Meredith"), Patrick Brickley ("Brickley"), and Jaime Ellertson ("Ellertson") captioned *Sylebra Capital Partners Master Fund LTD, et. al. v. Everbridge, Inc., et. al.*, Case No. 2:22-cv-02249, alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between November 4, 2019 and February 24, 2022 (the "Relevant Period") with respect to Everbridge's integration problems concerning its acquisition of numerous other companies (the "Securities Class Action"); and (iv) other publicly available information, including media and analyst reports, concerning Everbridge.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder brought on behalf of nominal defendant Everbridge against certain officers and members of the Company's Board of Directors (the "Board").

2.     Everbridge is a global software company that provides enterprise software applications to automate and accelerate organizations' operational response to "critical events" to

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

keep people safe and organizations running.  The events for which the software is designed to operate include public safety threats, Information Technology ("IT") outages, cyber-attacks, product recalls, or supply-chain interruptions.

3.      Shortly before and throughout the Relevant Period, Everbridge engaged in an unusual buying spree, purchasing nine separate companies.  During that same time, the Individual Defendants (defined herein) misled investors regarding both the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from those acquired companies were being used to mask increasingly stagnant organic growth.

4.      The Individual Defendants misled investors when they were specifically asked whether in fact the Company was experiencing any integration problems with respect to its acquisition of numerous companies during the Relevant Period, saying, for example, as to one acquired company, xMatters, that "integration is just starting, but it's already going great," and two months later that integration was "probably ahead of schedule."  In fact, however, upon information and belief, Everbridge was unable to effect complete integration of these acquired companies as their products required multiple, different systems, running on different internal databases, with dedicated legacy sales staffs trained and operating differently than those originally with Everbridge, leading many to leave the Company.

5.      As well, during the Relevant Period, the Individual Defendants led investors to expect that every quarter and fiscal year the Company would achieve revenue growth over and above 30%, with acquisitions making up only about 5% of that aggregate figure, and in each such reporting period they boasted that the Company had exceeded its own guidance.  However, Everbridge's publicly available financial statements did not break out aggregate revenue amounts by business segment.  The result was a lack of transparency as to the extent to which organic growth was lagging and the Company was only able to continue with this pattern by acquiring other companies and using their legacy revenues to fill in the gaps.

6.      Both of these related misleading courses of action, in combination with each other, were unsustainable.  The failure to fully integrate the acquired companies with Everbridge, and the increasing complexity their products introduced into the Company's offerings, rendered it increasingly difficult to pitch a single, coherent system to Chief Information Officers of prospective customers.  The eventual result was a drop off of organic sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions.

7.      Combined with this event was the collapse of the Individual Defendants' persistent effort to falsely portray the COVID pandemic as a "net-net" positive for Everbridge, including the misrepresentation that the pandemic had not diminished the size of deals that Everbridge was able to secure with customers or, later, that such an effect had been reversed.

8.      The truth regarding Everbridge's failed growth strategy was partially revealed through a press release issued after the close of the regular trading session on December 9, 2021. On that date, the Company disclosed that Defendant Meredith had unexpectedly resigned as Chief Executive Officer ("CEO") without providing a reason for his departure.  The Company also provided 2022 revenue growth guidance of between 20%-23%, well below the expected baseline of 30%.  On this news, Everbridge's common stock price fell almost by half, a price decline of $52.37 per share, or 45.4%, to close at $63.00 per share on December 10, 2021.

9.      Then, on February 24, 2022, after the close of regular trading, the full truth was revealed.  On that date, Everbridge announced its financial results for the fourth quarter and full year 2021, as well as its guidance for the first quarter and full year 2022.  As to revenue, the Company guided only 20% growth in the first quarter of 2022 and a scant 15%-17% growth for the full year, even lower than the disappointing guidance previously issued in December 2021.

10.     On February 25, 2022, Everbridge's common stock price fell another $15.68 per share, or 33.9%, to close at $30.61 per share.

11.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Everbridge has sustained damages as described below.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because they reside in this district or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state and has consented to service in this state.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Everbridge occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff is a stockholder of Everbridge, was a stockholder of Everbridge at the time of the wrongdoing alleged herein, and has been a stockholder of Everbridge continuously since that time.

16.     Nominal Defendant Everbridge is a Delaware corporation, based in Burlington, Massachusetts with its West Coast headquarters located in Pasadena, California.  The Company's common stock is listed on the NASDAQ Global Market under the ticker symbol "EVBG."

17. Defendant Meredith served as CEO of Everbridge as of July 15, 2019 and during all relevant times prior to December 9, 2021, on which date he unexpectedly resigned from that post.

18. Defendant Brickley served as Senior Vice President and Chief Financial Officer ("CFO") of Everbridge as of March 1, 2019, months before the start of the Relevant Period, including during all relevant times. After December 9, 2021, he also served as interim co-CEO.

19. Defendant Ellertson has served as Executive Chairman of the Board during all relevant times, preceding Meredith as CEO before July 15, 2019.

20. Richard D'Amore ("D'Amore") has served as a member of the Board since April 2015. He is a member of the Audit Committee.

21. Alison Dean ("Dean") has served as a member of the Board since July 2018. She serves as Chair of the Audit Committee.

22. Bruns Grayson ("Grayson") has served as a member of the Board since 2011. He serves as Chair of the Nominating & Corporate Governance Committee and is a member of the Compensation Committee.

23. Kent Mathy ("Mathy") has served as a member of the Board since August 2012. He is a member of both the Audit Committee and the Compensation Committee.

24. Simon Paris ("Paris") has served as a member of the Board since February 2020.

25. Sharon Rowlands ("Rowlands") has served as a member of the Board since January 2019. She serves as Chair of the Compensation Committee and is a member of the Nominating & Corporate Governance Committee.

26. Defendants Meredith, Brickley, Ellertson, D'Amore, Dean, Grayson, Mathy, Paris, and Rowlands are collectively referred to hereinafter as the "Individual Defendants."

27. Non-Party David Henshall ("Henshall") has served as a member of the Board since January 2022. He served an initial tenure as a member of the Board from 2015 to 2018.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Everbridge were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

31.     Each Individual Defendant, as a director and/or officer, owed and owes to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.     In addition, the Company has also adopted a Code of Conduct (the "Code").  The Code states in its preamble:

**Policy Overview**

This Code of Business Conduct flows directly from our commitment to our mission and core values.  We consistently aim for excellence and to provide value for both our customers and stockholders, and it is critical that we do so with integrity and

high ethical standards.  It is unacceptable to cut legal or ethical corners for the benefit of Everbridge, Inc. ("Everbridge") or for personal benefit.  This code is intended to deter wrongdoing as well as the appearance of wrongdoing.  Doing the right thing is more important than winning while risking our reputation or the trust of our customers, partners and stockholders.  This code is designed to ensure:

- operating our business ethically and with integrity;

- avoiding actual or apparent conflicts of interest;

- compliance with the letter and spirit of all laws and Everbridge policies, including full, fair, accurate, timely and understandable disclosure in reports and documents we file with the U.S. Securities and Exchange Commission (the "SEC") and in our other public communications; and

- the prompt internal reporting of suspected violations of this code.

33.    The Code goes on to state:

The code applies to all of us: the directors, executives, employees and independent contractors of Everbridge and its subsidiaries.  In addition to our own compliance, all of us must ensure that those we manage, and those that we hire to work on our behalf, comply with this policy.

*          *          *

Accurate Financial and Accounting Disclosures

Our principal executive officer, principal financial officer and people who perform similar functions are our "senior financial officers" and are responsible for ensuring that disclosures in our periodic reports and other public communications are full, fair, accurate, timely and understandable.

34.    In addition, the Board's Audit Committee has its own charter.    The Audit Committee Charter states in pertinent part:

The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Everbridge, Inc. (the "Company") shall be to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (ii) the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the

8

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

"Auditors"), (iii) review any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein and (iv) the performance of the Company's internal audit function, if any.

*     *     *

**RESPONSIBILITIES**

**Audited Financial Statement Review.** To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and any disclosure from the Company's CEO and CFO to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

**Annual Audit Results.** To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

**Auditor Communications.** At least annually, to discuss with the Auditors the matters required to be discussed by Auditing Standard No. 16, Communications with Audit Committees, as amended, as adopted by the PCAOB (including any successor rule adopted by the PCAOB), as well as all other relevant matters brought to the attention of the Committee by the auditors.

**Quarterly Results and Reports on Form 10-Q.** To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's CEO and CFO to be made in connection with the certification of the Company's quarterly reports filed with the SEC, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Management's Discussion and Analysis.** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**Press Releases.** To review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

**Accounting Principles and Policies.** To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

**Risk Assessment and Management.** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

## SUBSTANTIVE ALLEGATIONS

**COMPANY BACKGROUND**

35.     Everbridge is incorporated in Delaware and maintains a West Coast headquarter in Pasadena, California.  The Company is an enterprise software company that provides, among other things, software as a service ("SaaS").  SaaS delivers applications over the internet that are intended to be used as a service.  Instead of installing and maintaining software, the user has access to it through the internet, and the provider, in this case Everbridge, delivers all software and hardware management.

36.     Everbridge's value proposition to its customers – businesses as well as non-profit enterprises, educational institutions, and public agencies of municipal, state, federal, and foreign governments – is that its products will improve their operational response to a variety of physical and digital risks and dangers, thereby safeguarding their employees, customers, assets, supply chains, and operations.

37.     The Company separates its product offerings into three categories: (i) Mass Notification applications designed to communicate to an entire defined population in the event of a threat or emergency; (ii) applications intended to monitor potential threats and/or proactively manage any that are active, including providing an automated response; and (iii) Critical Event Management ("CEM") that is a suite of its various products, created to provide a purported integrated response to risks and threats.

38.     Everbridge derived a substantial, even if declining, portion of its revenues during the Relevant Period from sale of its Mass Notification products – 61%, 50%, and 42% in 2019, 2020, and 2021, respectively.  Though considered the Company's core service offering, Defendant Brickley stated at a March 5, 2020 Company conference presentation that "we knew pre-IPO, that you can't really go public and sustain on just the mass notification opportunity" as it was "not growing super quickly."

39.     Everbridge sold all of its applications on a subscription basis, pursuant to 1 to 3 year term contracts.  In turn, it derived most of its revenue from either payments pursuant to new contracts or the renewal of contracts, with such amounts representing 90%, 89%, and 89% of total revenue in 2019, 2020, and 2021, respectively.

40.     On June 19, 2019, during a shareholder/analyst conference call, Defendant Brickley stated at a that "[a]s a result, we have great visibility and predictability into the future, and we continue to have that."  Throughout the Relevant Period, the Company represented that its renewals were at 110% of the original contract amount.

**THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS
REGARDING REVENUE GROWTH FROM ACQUISITIONS**

41.     The remainder of the Company's revenues, which were needed to show revenue growth, came from new clients and cross-selling and up-selling additional and new products to its existing client base.  The guidance that the Company provided for each fiscal quarter and year was, as Defendant Ellertson stated on the February 18, 2020 fourth quarter 2019 earnings call, "30% to 35% growth on an annualized basis.  And that's comprised of organic growth plus a couple of percentage points, not much different than what we said historically, 3% to 7% from M&A."

42.     During the February 28, 2019, Company conference prior to the Relevant Period, Defendant Ellertson claimed that "[w]e don't buy revenue typically" in relation to Everbridge's Merger & Acquisition ("M&A") purchases.  The Company's Form 10-K for fiscal year 2019, filed on February 28, 2020, stated that "[w]e plan to continue to selectively pursue acquisitions of complementary businesses, technologies and teams that allow us to penetrate new markets and add features and functionalities to our platform."

43.     From near the beginning of the Relevant Period to its end, Everbridge purchased nine new companies, all of which, alone or together, enabled the Company to beat analyst consensus estimates and its own revenue guidance because of acquired revenue.  The companies acquired during the Relevant Period were:

12
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| COMPANY NAME | DATE OF ACQUISITION | ASSET ACQUIRED |
|---|---|---|
| NC4 Inc. and NC4 Public Sector | August 1, 2019 | Real time intelligence and analyst team |
| One2Many Group B.V. | March 23, 2020 | Cell broadcast technology to enhance the Company's public warning applications |
| Connexient, Inc. | March 31, 2020 | Technology assets to broaden support for Internet of Things ("IoT") applications |
| CNL Software Limited | March 31, 2020 | Technology assets to broaden support for IoT applications |
| Techwan SA | May 27, 2020 | Strategic technology assets |
| SnapComms Limited | September 30, 2020 | Internal communications software |
| Red Sky Technologies Inc. | January 15, 2021 | E911 incident response solutions platform |
| xMatters Holdings, Inc. | May 7, 2021 | Service reliability platforms |

44.     Throughout the Relevant Period, certain analysts expressed skepticism as to the extent to which Everbridge's ever-increasing guidance and results provided an accurate reflection of organic growth.

45.     During the February 18, 2020 fourth quarter 2019 earnings call, one analyst asked the following question:

> But if I look at your revenue guidance, it seems like you're guiding below the 30% mark organically, which will be below the commentary that Jaime spoke about earlier for sustainable 30% growth with M&A in addition to that.  Are there any one-timers that we should be thinking about or just timing of revenue recognition that are impacting fiscal '20?

46.     Defendant Ellertson responded by obscuring the difference between organic growth and contributions from recently acquired companies:

> So when you look at the second half of Q4 and what we said to expect from NC4 [acquisition] ("NC4") and you adjust for that, you'll see that we've had strong

13

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

organic growth.  And as I said earlier, as we head into 2020, we've really integrated NC4 and Risk Center into our entire product offering.  And so it's difficult to break that out.

47.     Relatedly, throughout the Relevant Period, the Individual Defendants insisted that Everbridge had been successfully integrating all of its acquisitions, without any hint of trouble.

48.     During the June 10, 2021 corporate presentation, Defendant Meredith made the following claim relating to all of Everbridge's acquisitions: "And I would say we've been really good about getting the capabilities integrated."

49.     Similarly, on the November 9, 2021 third quarter earnings call, Defendant Brickley said as to the xMatters acquisition, "[w]e've integrated the people.  We've integrated the sales.  We've integrated the funnels.  We're integrating the technology.  So we don't break it out.  But so far, so good."

50.     The Individual Defendants further made false and misleading representations to the investing public during the Relevant Period regarding the extent to which its sales were being adversely affected by disruptions caused by the COVID pandemic.  While adverting vaguely that certain customers were delaying purchases or payments, the Individual Defendants consistently used the term "net-net" to misleadingly suggest that the pandemic was on the whole a positive for the Company.  That is, Everbridge developed and offered to customers a COVID Shield solution, providing, among other things, contact tracing capabilities and a return-to-work solution.  During most of the Relevant Period, the Individual Defendants claimed that the revenue and additional clients obtained by these offerings outweighed any negative impact on Everbridge's business.

51.     On a March 23, 2020 shareholder/analyst call, when asked if the pandemic was making it "more difficult to sell," Defendant Meredith responded, "net-net, I think we're just getting – we're very busy.  We're getting a lot of engagement, and we're working harder than we've ever worked.  And the system is producing at volumes that are much higher than we've ever had to produce at."

52.     On the August 6, 2020 second quarter  earnings call, Defendant Brickley said that while Everbridge had received some requests from customers for changes in payment terms, "I

don't anticipate that it's adding anything materially new to our billings dynamic."  Defendant Meredith further asserted that "I don't think it impacts deal sizes" and that "I would say the net-net of it is, overall, the sales funnel pipeline is stronger overall."

53.     At another corporate presentation on May 12, 2020, Defendant Brickley similarly said "net-net, it should be a positive."

54.     Based on these material misrepresentations and omissions made by the Individual Defendants throughout the Relevant Period, Everbridge's investors were falsely led to believe that: (i) the Company was experiencing healthy organic growth; (ii) it was successfully and seamlessly integrating all of the nine companies it had acquired into its business; (iii) the multiple new offerings obtained from these acquisitions were enhancing the Company's ability to make new sales to customers, and (iv) Everbridge was experiencing a net positive affect on its revenues during the COVID pandemic.

### THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING EVERBRIDGE'S ABILITY TO EXCEED ITS GUIDANCE

55.     On November 4, 2019, Everbridge issued a press release announcing its financial results for the third quarter ended September 30, 2019.  In the press release,  Defendant Meredith was quoted saying "[w]e exceeded our guidance ranges for revenue and profitability in the third quarter, with continued demand for our Critical Event Management Suite and Public Warning solutions."

56.     During the related earnings call, also on November 4, 2019, Defendant Ellertson stated, "[o]ur Q3 results exceeded the high end of our guidance ranges."  Following up on that statement, Defendant Meredith emphasized the point, saying "[a]s Jaime indicated, *we beat our financial guidance for the third quarter, continuing the track record we've achieved every quarter since our IPO over 3 years ago* Revenue was $52.5 million, representing growth of 35%, including contribution from our NC4 acquisition."[1]  Defendant Brickley also claimed that "we are

---

[1] Unless otherwise stated, all emphasis is added.

15

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

pleased to again deliver a financial performance that exceeded our guidance ranges, and we believe we are entering the fourth quarter with strong business momentum across the board."

57.     While the Individual Defendants acknowledged that revenues from the NC4 acquisition contributed to the third quarter results, the statements contained in ¶¶ 55-56 above as to the continuation of a track record of beating the Company's own financial guidance and, therefore, providing evidence of the growing attraction of Everbridge's CEM suite and its other products, were materially misleading and reflect manipulation of the Company's guidance.

58.     On August 5, 2019, the Company held its earnings call for its second quarter ended June 30, 2019.  During the call Defendant Brickley provided third quarter guidance with  a revenue between $51.3 million to $51.6 million, which was the basis for a number of Wall Street analysts to agree on a revenue estimate of $51.4 million.

59.     On the same call, Defendant Brickley also stated that "[g]iven that certain components of the transaction will not be finalized until the end of the third quarter, and that purchase accounting cannot be completed until then, we will not be updating our guidance for the acquisition until our third quarter call."  At the same time, however, he also said that "[o]ur outlook for the rest of the year includes a *minimal contribution to revenue for known NC4 contracts*, most of which will be recognized in Q4."  In other words, even though the purchase accounting could not be completed, Defendant Brickley recognized that it could affect part of the financial results for the rest of the year.  So the Company was aware of the legacy revenue the deal would bring in from "known NC4 contracts" (some of which would be in included in Everbridge's third quarter results) and that the guidance Defendant Brickley provided accounted for the revenue derived from the NC4 contracts.

60.     On November 4, 2019, the Company held the third quarter earnings call. During the call, Defendant Brickley revealed that the third quarter results "included a better-than-expected contribution of approximately $2 million from our acquisition of NC4."

61.     The Company provided no explanation for that purportedly surprising additional revenue from NC4, including whether additional contracts beyond those already "known" were

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

discovered.  Notably, given that the third quarter 2019 revenue exceeded guidance by slightly more than $1 million, absent that surprise $2 million of another company's sales results (or any amount over what had purportedly been expected), Everbridge would have come in only at or below its own guidance and possibly that of the Wall Street consensus estimate.

<b>THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS<br>REGARDING EVERBRIDGE'S INTEGRATION OF ACQUISITIONS</b>

62.     During Everbridge's third quarter earnings call on September 4, 2019, an analyst tried to get information as to what financial contribution NC4 provided beyond its legacy revenues. The analyst  asked, "[i]n terms of contributions from NC4 in the quarter, I believe you said it was roughly $2 million of revenue.  But any color on the impact to billings at all in the quarter?" Defendant Brickley's unclear response was:

> No, as we said, there's the revenue contribution with the upcoming 10-Q, there'll be more detail in terms of deferred, but you also would have seen some of that in a recently filed 8-K for the legacy business.  So we would just say that we're really thrilled with the acquisition.  It's meeting our strategic objectives.  And *as we integrate and rightsize that business*, which will continue to happen through Q4 and as we head into next year, we're very excited about the contribution that it has, not just financially, but more importantly, strategically.

63.     Also during the November 4, 2019 earnings call, Defendant Brickley stated that "[n]ow that we've closed the acquisition of NC4 and are *well down the path of rightsizing and integrating that business*, we are updating our expectations for the revenue contribution from NC4 this year to be approximately $4.5 million."

64.     Moreover, during the February 18, 2020 fourth quarter 2019 earnings call, Defendant Brickley further claimed, "[a]nd because *NC4 is now fully integrated* into Risk Center and it's not sold separately, it's impossible to attribute a revenue contribution from it alone." Defendant Ellertson reiterated this representation, stating "we've really integrated NC4 and Risk Center into our entire product offering.  And so it's difficult to break that out."

65.     During the March 23, 2020 shareholder/analyst call, Defendant Meredith claimed:

17<br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

[I]f you look at the **acquisitions that we have done with Connexient, one2many and others**, we now have over 225 out-of-the-box **integrations**.  So we now truly can be that **unified enterprise-wide operating system** to allow you to operate across your business, your organization globally, and that's very powerful and that's very sticky.

66.     During the first quarter earnings call on May 10, 2021, Defendant Meredith further stated that, "**[n]ew CEM product features** and capabilities announced in the first quarter, combined with our recently closed **acquisition of xMatters** further support this approach.  In our first quarter, this strategy **continued to drive greater market acceptance of our CEM platform** as illustrated by larger wins."

67.     At a June 10, 2021 Company conference, Defendant Meredith expressed, "[s]o we're really excited.  **The integration is just starting, but it's already going great**.  We've been getting pulled in more and more from our customers.  And they're saying, we really want a common operating system in a single pane of glass across all digital and physical."  Furthermore, as to Everbridge's ability to seamlessly integrate new acquisitions, Defendant Meredith stated, "[h]istorically, we've, I think, been pretty prudent about what we paid.  And I would say **we've been really good about getting the capabilities integrated**."

68.     During the August 9, 2021 second quarter earnings call, Defendant Meredith added:

And speaking of cybersecurity, with cyber and ransomware attacks regularly making news headlines, our timing for executing the acquisition of xMatters could not have been better.  **Our integration plans are on schedule** and the combination of Everbridge and xMatters solutions to deliver the leading digital and physical critical event management platform is already performing ahead of our initial expectations, and we expect this trend to continue.

69.     Indeed, on the same call, Defendant Meredith further asserted:

They understand our space and the strategic fit of digital plus physical is resonating well with customers.  And so based on our internal expectations, what we thought we'd do on sales, like we're doing better.  And so we certainly are going to try to continue that.  **We are integrating**.  We did have an ITA business previously.  So we're integrating those teams.  **They've already been integrated.**

70.    Defendant Brickley added at the same conference that the "[p]ipeline as it relates to xMatters, well, we've been integrating the businesses practically since before the acquisition began."

71.    At the November 9, 2021 third quarter earnings call, Defendant Meredith represented that "[t]here's an increased awareness of the importance of CEM.  And we're ***doing a better job of bundling together our different CEM capabilities*** into deals, and that's manifesting itself in the ASPs [average selling prices] and the large deals."  Specifically addressing the xMatters acquisition, he further stated:

> Obviously with the xMatters platform.  It was many years of development, really nice system interface functionality use cases digital operations.  It's – it really adds a lot of capability to what we were doing with our IT Alerting.  And we're already doing integrations, right?  ***So we've got that integrated now with our crisis management module, we've got [it] integrated with our employee communications module, integrated with our Visual Command Center***.  So people are seeing the value of it coming together over time and giving us really positive feedback.

72.    Defendant Brickley added that "it's performing as expected.  We've integrated the people.  We've integrated the sales.  We've integrated the funnels.  We're integrating the technology.  So we don't break it out.  But so far, so good."

73.    During a November 30, 2021 Company conference, Defendant Brickley responded to a question as to the status of the xMatters acquisition using similar language to what he had said during the earnings call, claiming that "[w]e've begun that technological integration.  We've locked up key hires, and we're retaining them.  And so, so far, so good."

74.    The statements contained in ¶¶62-73 were materially false and/or misleading when made because the Individual Defendants failed to disclose that Everbridge struggled to integrate the new businesses it acquired because, upon information and belief, the products of the acquired companies required multiple, different systems to operate, running on different internal databases that need dedicated sales staff (located in different time zones) to operate and handle the different procedures and sales software.  The inability of Everbridge to integrate the sales staff of the acquired companies led to most of them leaving the Company, taking with them crucial knowledge

and sales expertise.  With each new company acquired, the integration problems multiplied.  These problems, combined with the increasing complexities of Everbridge's product line, made it extremely difficult for Everbridge to license its products to new and existing customers.

## THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING THE IMPACT OF COVID ON EVERBRIDGE

75.     On May 5, 2020, the Company held its first quarter earnings call.  An analyst asked about the impact COVID had on the Company's go-to market, among other things, and whether their customers were holding off or purchasing more of their products. Defendant Meredith responded by saying:

> So I think – net-net, I think we're just getting – we're very busy.  We're getting a lot of engagement, and we're working harder than we've ever worked.  And the system is producing at volumes that are much higher than we've ever had to produce at.  But this is why we built a scalable cloud-based system, and it's working the way it's supposed to.

76.     Also, during the May 5, 2020 earnings call, an analyst asked Defendant Brickley if Everbridge was experiencing "actually a pull forward in demand?  And could that actually create some tougher compares or growth headwinds in either the back half of the year or beginning the next year?" Defendant Brickley recognized that COVID had "impacted our business in the last few weeks of the quarter," but also stated that there were "cross-currents" and on balance saw the pandemic having a positive impact on the Company:

> And I think . . . Some deals were very clearly pulled forward from future quarters, where it was very vivid of the urgency to upsell to CEM, get it turned on and help customers, even some of those in the hardest-hit verticals, to manage through the impact of COVID to spin down their operations quickly and effectively, and further to be able to spin them back up as quickly and effectively as possible when that – when the time is right.
>
> So we saw that.  We also saw a couple of examples of folks who said they're a little too busy dealing with COVID to implement a solution that helps them deal with COVID.  And so that's part of what I think as – so we got the kind of the upfront, and there's a whole lot of increased awareness and interests and a lot of inbound interests.  And then I think for a number of those folks, who were too overwhelmed

in those last couple of weeks of March, they'll – eventually, things will come down for them, and they'll be able to come back around.

So *we think, net-net, it's an acceleration of our -- when we came in, so 2020 thinking was an opportunity for us, a strategic opportunity*, create this category, increase awareness of CEM, increase awareness of Everbridge. *We think this has just accelerated that.  Everything that's relevant to COVID, it's a critical event*. Everything that our software does to help customers through COVID, helps them through other critical situations as well.  *So net-net, it should be positive*.

77.     During Everbridge's second quarter earnings call on August 6, 2020, Defendant Brickley was asked if because of COVID and other "macro" events, the Company was seeing any changes in its billing.  Defendant Brickley responded:

We're continuing to see that we are high up on the totem pole when it comes to the organizations that are in distressed verticals or the most distressed verticals, reaching out to their vendors and their partners for payment term requests because *while we've certainly received some of such requests, it seems like we're receiving far less than a number of my peers are*.  So I think that bodes well, and it's never a question of whether [they] can pay.  So there's some of that out there, but *I don't anticipate that it's adding anything materially new to our billings dynamic*.

78.     When asked on the same call if the COVID pandemic was affecting deal sizes, Defendant Meredith claimed it was not:

*I don't think it impacts deal sizes*.  I do – I think that emphasis placed on certain use cases that are more relevant now than other use cases.  So there are some use cases that in normal times, they would be more focused on.  And – but I would say *the net-net of it is, overall, the sales funnel pipeline is stronger overall*.  And where – the sales cycles are getting shorter, but we are – it's a different set of use cases that are of primary interest at this time versus something that would have been 9 months ago.

79.     Similarly, during an August 12, 2020, Company conference presentation, Defendant Meredith stated:

And there's some things that help us with COVID, there's some things that make it very difficult with COVID, depends on the use case.  *But the overall trend continues to be up and to the right* and we think people will be more aware in time that, wow, this is a big category, and we understand what Everbridge has been aiming for all along.  So I think people are coming around, and I think that will become more evident.

21
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

80.     The statements contained in ¶¶75-79 were materially false and/or misleading when made because the Individual Defendants failed to disclose that since the beginning of the COVID pandemic and throughout the rest of the Relevant Period, the Company was and continues to be materially impacted by the pandemic. Among other things, the COVID pandemic negatively impacted the size of the deals the Company was obtaining and its revenue growth.

81.     Indeed, Defendant Brickley admitted as much during a December 2, 2021 Company conference presentation, saying:

> So when COVID really started to kick in, in March of 2020, I think there was a great expectation that we were going to be like Zoom, like everyone is going to need the alerting and I think our stock ran really far really fast.  And what happened was – I had mentioned that the *majority of our revenues from corporate – well, corporate's starting to pump the brakes*, and we had a lot of large deals in the pipeline where they said, "I no longer want the full platform right now, just give me a component of the platform that I can take and use specifically during COVID, and then we'll grow from there."  And so what the impact of that, *as COVID kicked in, was our ASPs dropped*.
>
> We have been optimizing our go-to-market – since we've been building out this platform, we've been to optimize our go-to-market to sell at higher prices to sell multiple products.
>
> And we had gotten our ASP up from what used to be $25,000, $30,000.  We've gotten up to $80,000, $90,000, and then COVID hit, and it dropped back down closer to 60%.  *And so that bled into revenue*, it's ratable recurring revenue.  *So there's only so much you can do if your initial sale is a lot lower priced than it used to be*.

82.     Nonetheless, Defendant Brickley wholly downplayed the effect of these admissions.  First,  he yet again discussed the purported "tailwind" effect of greater awareness on Everbridge's value to a wider audience that COVID brought.  Moreover, for investors concerned with Everbridge's share price, Defendant Brickley claimed that "we're seeing ASPs return," that "deals were coming back," in both the corporate space and, even if "a bit more slowly," with regard to deals with governments and health care entities.  Even more significantly, by estimating 2021 revenue growth at "35%, 36%," Defendant Brickley relieved any anxiety that shareholders may have had by saying "[n]ext year, we're going to do better."

## THE INDIVIDUAL DEFENDANTS' MATERIALLY
## FALSE AND MISLEADING PROXY STATEMENTS

83.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue false and misleading proxy statements which sought shareholder votes for, *inter alia*, director re-election and an approval of an amendment to the Company's Certificate of Incorporation to eliminate the supermajority voting requirement for (i) amendments to the Company's Certificate of Incorporation and (ii) stockholder amendments to the Company's Amended and Restated Bylaws (the "Bylaws").

84.    On April 3, 2020, the Individual Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2020 Proxy") in connection with the Company's annual shareholder meeting.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2020 Proxy before it was filed with the SEC and disseminated to Everbridge's shareholders.  The Individual Defendants knew or were deliberately conscious in not knowing, that the 2020 Proxy was likewise materially false and misleading.

85.    Among other things, the 2020 Proxy provided information about the director nominees up for election, Defendants Ellertson and Rowland.  In addition, the 2020 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

86.    The 2020 Proxy was false and misleading because it solicited Everbridge shareholder votes for director reelection even though the Individual Defendants were aware but failed to disclose that they had made false and misleading statements regarding: (i) Everbridge's revenue growth from acquisitions; (ii) Everbridge's ability to exceed its guidance; (iii) integration of its acquisitions; (iv) the impact of COVID on Everbridge; and (v) that, as a result of the foregoing, the Individual Defendants' statements about Everbridge's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

87.     On April 7, 2021, the Individual Defendants caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2021 Proxy") in connection with the Company's annual shareholder meeting.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2021 Proxy before it was filed with the SEC and disseminated to Everbridge's shareholders.  The Individual Defendants knew or were deliberately conscious in not knowing, that the 2021 Proxy was likewise materially false and misleading.

88.     Among other things, the 2021 Proxy provided information about the director nominees up for election, Defendants Dean, Mathy, and Paris.  The 2021 Proxy also sought approval of an amendment to the Company's Certificate of Incorporation to eliminate the supermajority voting requirement for (i) amendments to the Company's Certificate of Incorporation and (ii) stockholder amendments to the Company's Bylaws.  In addition, just like the 2020 Proxy, the 2021 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

89.     The 2021 Proxy was false and misleading because it solicited Everbridge shareholder votes for director reelection and an amendment to the Company's Certificate of Incorporation even though the Individual Defendants were aware but failed to disclose that they had made false and misleading statements regarding: (i) Everbridge's revenue growth from acquisitions; (ii) Everbridge's ability to exceed its guidance; (iii) integration of its acquisitions; (iv) the impact of COVID on Everbridge; and (v) that, as a result of the foregoing, the Individual Defendants' statements about Everbridge's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

### THE TRUTH IS REVEALED

90.     On December 9, 2021, Everbridge announced that Defendant Meredith had abruptly resigned as CEO with no explanation for this decision.  Defendant Brickley and Vernon Irvin ("Irvin"), Everbridge's Chief Revenue Officer, were appointed as interim co-CEOs.

91.     Also on December 9, 2021, Everbridge announced that it reduced revenue guidance for 2022 to 20%-23% growth, well below its historic forecasts of 30% plus revenue growth.

92.     On this news, Everbridge's common stock price fell $52.37 per share, or almost by half, 45.4%, to close at $63 per share on December 10, 2021.

93.     On December 13, 2021, J.P. Morgan published a report noting that Defendant Meredith's sudden departure was at odds with the continued positive gloss that he and the other Individual Defendants had put on Everbridge's growth potential throughout the Relevant Period. By resigning as CEO, Defendant Meredith left on the table approximately 34% of the restricted stock units that were awarded to him that remained unvested, and approximately 55% of the remaining unvested performance-based compensation.  The latter depended on the Company's compounded annual growth rate over the twelve quarters ending September 30, 2022. Accordingly, J.P. Morgan made the cogent observation that, "[w]hat we found is that [Meredith] is leaving a decent amount on the table with his departure.  If the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance- based incentive."

94.     Truist Securities wrote in its December 23, 2021 report that "The company's 20%-23% initial growth outlook is certainly disappointing and is counter to at least a mid-20% organic growth narrative with acquisitions that drive total growth of 30%-plus."  Indeed, Raymond James stated in its December 16, 2021 report that, "[w]hile we don't have exact details on the xMatters and Anvil contributions to revenue growth next year, we believe the guidance implies organic revenue growth in the high teens range."  Indeed, Northland Capital Markets stated in its December 10, 2021 report that the lowered guidance was also "a little at odds with macro trends" which would be expected to benefit a threat mitigation company, "such as a continued barrage of critical events, the uncertainty remaining around Covid, strong public safety investments in other areas, digital transformation plans, and the rise of the CSO within companies."

95.     On February 24, 2022, Everbridge issued a press release announcing fourth quarter 2021 results and guidance for the 2022 first quarter and full year.  First quarter revenue growth for

2022 was forecasted at only 20% and full year growth was again, substantially reduced to 15% to 17%.

96.    In the February 24, 2022 press release, Co-CEO Irvin was quoted as saying, "[w]e are taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."  Everbridge officers further explained during the related earnings call why these measures were being taken and disclosed for the first time material facts that were completely in opposition with the Individual Defendants' representations throughout the Relevant Period.

97.    Irvin further stated that "our management team, together with the Board, conducted a comprehensive review of our strategy and operations."  The review, however, was apparently focused on matters that, during the Relevant Period, the Individual Defendants had discussed extensively with investors and analysts, independently and in answer to questions posed to them, and as to which they presumably were intimately familiar.

98.    Irvin detailed that this review resulted in the conclusion that "certain acquired technologies" **had created a "barrier to upsell and cross-sell from increased complexity**, *and incomplete integrations* and pushed out demand for travel-related solutions, as well as smaller deal size for international public warning wins that are having adverse impacts on business, our go-to-market strategy and sales organization."  Irvin further indicated that "the number of acquisitions completed in 2020 and 2021," along with their products and businesses "***created incremental product line complexity that produce integration challenges*** and have complicated our go-to-market efforts."

99.    Moreover, Irvin indicated that Everbridge's international public warning business is:

> [S]eeing **meaningful contraction in the size of countrywide deals** as compared to the wins that we are seeing over the past couple of years.  These deals saw contractions, coupled with long-dated public warning implementation timelines, suggest to us that our near-term wins for large- and medium-sized countrywide public warning deals will be smaller than previously estimated.

100.   In addition, contrary to what was previously stated at the December 2, 2021, corporate conference, Irvin stated that the Company's "current revenue outlook for 2022" was influenced by "lowering ASPs, and longer implementation time."

101.   Defendant Brickley expanded upon these revelations by acknowledging that "we were well down a path of selling dozens of solutions that were *not always tightly integrated*.  We were selling them to multiple buyers.  And as Vernon said, that was *confusing to customers and to our sellers*."

102.   As to the decline in the Company's international deal sizes, contrary to what he had said at the December 2, 2021 corporate conference presentation, Defendant Brickley made no mention of ASPs and deal sizes "coming back," or that COVID was "net-net" a positive for the Company.  He did, however, acknowledge, also contrary to his prior statements and that of Defendant Meredith, that "contraction in deal sizes has been exacerbated by lingering effects of COVID."

103.   The action plan from this review was to "paus[e] material new M&A and instead prioritiz[e] development efforts to focus on accelerating product integrations across our existing acquired assets."  In addition, Everbridge intends to "simplif[y] our product offerings, moving from several dozen individual product – point products to focus on 4 strategic CEM solutions."  In particular, the Company will "deemphasize certain smaller, nonstrategic products that don't fit cleanly into our CEM and public warning focus areas.  While these products do deliver some stand-alone revenue, they are a distraction to our primary focus and *negatively impact our sellers' overall productivity*."

104.   Defendant Brickley estimated that there would be a total $32 million hit to revenues.  Defendant Brickley estimated that the renewed focus on integration and simplification would create a $17 million "headwind" to revenue, and that "countrywide pricing trends in certain markets and elongated implementation time lines" would result in a second $15 million headwind.

105.   On this news, Everbridge's common stock price fell an additional $15.68 per share, to close at $30.61 per share on February 25, 2022.

**DAMAGES TO EVERBRIDGE**

106.    As a result of the Individual Defendants' wrongful conduct, Everbridge disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated Everbridge's credibility.   Everbridge has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

107.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Everbridge to the Securities Class Action.

108.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Everbridge's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

109.    Moreover, these actions have irreparably damaged Everbridge's corporate image and goodwill.   For at least the foreseeable future, Everbridge will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Everbridge's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS**

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

112.    Plaintiff is an owner of Everbridge common stock and was an owner of Everbridge common stock at all times relevant hereto.

113.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

114.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Everbridge Board to institute this action against the Individual Defendants.   Such a demand would

be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

115.    At the time this action was commenced, the Board consisted of eight directors: Defendants Ellertson, D'Amore, Dean, Grayson, Mathy, Paris, and Rowlands (the "Director Defendants") and non-defendant David Henshall.   The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### DEMAND IS FUTILE AS TO DEFENDANTS ELLERSTON, D'AMORE, DEAN, GRAYSON, MATHY, PARIS, AND ROWLANDS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

116.    Defendants Ellertson, D'Amore, Dean, Grayson, Mathy, Paris, and Rowlands all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, presentations, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

117.    Moreover, the Director Defendants, as directors, owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the issuance and the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

118.    The Director Defendants' conscious and knowingly issuance and/or making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good

faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Everbridge to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

### DEFENDANT ELLERTSON LACKS INDEPENDENCE

119.   As an initial matter, Everbridge has conceded in its SEC filings that Defendant Ellertson is not an independent director of the Company.  In its 2022 Proxy, Everbridge states that a review of the independence of the Company's directors has determined that Defendant Ellertson is not independent.

120.   In addition, prior to his current stint on the Board, from July 2019 to December 2020, Defendant Ellertson served as Executive Chairman of the Board.  Prior to that, he served as the Chairman of the Board from March 2011 to July 2019, after joining the Board in April 2010. From September 2011 to July 2019, he also served as the Company's CEO, and from September 2011 to July 2017, Defendant Ellertson also served as the Company's President.  All of this is undoubtedly why Defendant Ellertson was determined to lack independence.

121.   Defendant Ellertson also is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

### DEMAND IS EXCUSED AS TO DEFENDANTS D'AMORE, DEAN, AND MATHY BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

122.   Defendants D'Amore, Dean, and Mathy, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the issuance and/or the filing of false financial statements and allowed Defendants Brickley, Ellertson, and Meredith to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, Defendants D'Amore, Dean, and Mathy were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, Defendants

D'Amore, Dean, and Mathy, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to Defendants D'Amore, Dean, and Mathy.

#### DEFENDANTS ELLERTSON AND GRAYSON ARE UNABLE TO INDEPENDENTLY CONSIDER A DEMAND DUE TO THEIR BUSINESS AFFILIATIONS

123.   Defendants Ellertson and Grayson lack the independence required to impartially consider a demand by Plaintiff due to their longstanding business relationship.  Defendant Grayson is the managing partner at ABS Ventures, a venture capital firm, where he has managed all of the firm's venture capital partnerships since 1983.  One of the partnerships was Everbridge.  As noted in the Company's S-1 filing with the SEC, under the "CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS" heading, upon Everbridge going public, "Cinta Putra, Jaime Ellertson and ABS Ventures IX L.P. are parties to our investors' rights agreement and were parties to our voting agreement and right of first refusal and co-sale agreement."  In fact, at the time of Everbridge's initial public offering, both ABS Ventures and Defendant Grayson were listed as owning 21.7% of the Company's shares.  The next largest shareholder was Defendant Ellertson with 9.4% of the Company's shares.

## COUNT I

#### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

124.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

125.   The Individual Defendants owed and owe Everbridge fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Everbridge the highest obligation of loyalty, good faith, due care, oversight, and candor.

126.   All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

127.    Each of the Individual Defendants had actual or constructive knowledge of and failed to disclose that they had made false and misleading statements regarding (i) Everbridge's revenue growth from acquisitions; (ii) Everbridge's ability to exceed its guidance; (iii) integration of its acquisitions; (iv) the impact of COVID on Everbridge; and (v) that, as a result of the foregoing, the Individual Defendants' statements about Everbridge's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.  These actions caused severe risks to the Company's financial viability and continue causing harm by subjecting Everbridge to the Securities Class Action.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.    The Individual Defendants consciously caused or allowed Everbridge to lack requisite internal controls, and, as a result, the Individual Defendants regularly made false and misleading statements regarding Everbridge's business results and prospects.

129.    The Individual Defendants consciously failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

130.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Everbridge has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to Everbridge and its shareholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Everbridge' business, rendering them personally liable to the Company.

## COUNT II

**AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9**

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

132.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

133.   The 2020 Proxy and 2021 Proxy both violated Section 14(a) and Rule 14a-9 because they solicited Everbridge shareholder votes for, *inter alia*, director reelection and an amendment to the Company's Certificate of Incorporation, while simultaneously misrepresenting and/or failing to disclose the Company's actual business results and prospects.

134.   As alleged herein, in the 2020 Proxy and the 2021 Proxy, the Individual Defendants specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.  Because the Company, under the Individual Defendants' direction and on their watch, was issuing false and misleading statements, the Individual Defendants affirmatively violated the Code.  The 2020 Proxy and the 2021 Proxy failed to disclose that express terms of the Code were being violated.

135.   The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2020 Proxy and the 2021 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2020 Proxy and the 2021 Proxy.

136.   The Individual Defendants knew that the statements contained in the 2020 Proxy and the 2021 Proxy were materially false and misleading.

137.   The omissions and false and misleading statements in the 2020 Proxy and the 2021 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors and to amend the Company's Certificate of Incorporation.  In addition, a reasonable investor would view a full and accurate disclosure as

significantly altering the "total mix" of information made available in the 2020 Proxy and the 2021 Proxy and in other information reasonably available to shareholders.

138.    As a direct and proximate result of the dissemination of the false and/or misleading 2020 Proxy and 2021 Proxy the Individual Defendants used to obtain shareholder approval of and thereby re-elect directors and amend the Company's Certificate of Incorporation, nominal defendant Everbridge suffered damage and actual economic losses in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Everbridge and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: June 27, 2022                                Respectfully Submitted,

                                                    **BRAGAR EAGEL & SQUIRE, P.C.**

                                                    */s/ Melissa A. Fortunato*
                                                    Melissa A. Fortunato (SBN 319767)
                                                      fortunato@bespc.com
                                                    Marion C. Passmore (SBN 228474)
                                                      passmore@bespc.com
                                                    445 S. Figueroa Street, Suite 3100

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 304-0506

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 1935
Telephone: (484) 875-3116
Facsimile: (914) 752-3041
Email: mhynes@hkh-lawfirm.com
        lhernandez@hkh-lawfirm.com

*Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT